THOMAS, Justice.
In this proceeding an attack is made upon an order of Florida Railroad and Public Utilities Commission which resulted, so it is contended by the petitioners, from a misconstruction of Sec. 323.29, Florida Statutes 1955, and F.S.A.
In the statute, enacted in 1931 to regulate the use of motor vehicles on the highways, the legislature recognized and declared that certain motor vehicles and services, because of their peculiar nature, should be exempt from the operation of the act and, therefore, from control of the Commission. Among them were “motor vehicles while engaged exclusively in transporting goods, wares, merchandise, horticultural, agricultural, or logs, lumber or other forest products, fish, oysters and shrimp, and dairy products, from the point of production to that [sic] point of primary manufacture, or from the point of production to the point of assembling the same, or from either such point of production, primary manufacture or assembling to a shipping point of either a rail, water or motor transportation company, usually and generally serving the territory in which said production, manufacture or assembling takes place.” Sec. 30, Chapter 14764, Laws of Florida, 1931, as amended, Sec. 323.29, supra. We have underscored the words which, primarily, render a construction of the section so troublesome.
Further exempted, by an amendment of the law, were motor vehicles used exclusively to carry “agricultural or horticultural products, supplies and materials, including fertilizers and sprays, when delivered direct to the growers or consumers, or to an association of such growers or consumers.” Chapter 18028, Laws of Florida, 1937, Sec. 323.29, supra.
The transportation described in the exemption was declared to be casual, seasonal, “not on regular routes or schedules”, slow-moving, often effected by special equipment, and extending for short distances.
It should be borne in mind that it is the vehicle itself which is affected although its exempt character must be determined by the load it carries, the manner in which it is used and the termini of the routes it traverses. Furthermore, in construing the third paragraph of the section consideration must be given to the nature of the consignees.
The pivotal question in this litigation is whether or not sand, phosphatic sand, dolo *711 mite, clay and crushed rock are products falling ip the definitions contained in the statute and meeting the requirements of the law so that their transportation is not subject to the jurisdiction and control of the Commission.
The Commission decided they did; the petitioners contend they do not.
Rockana Carriers, Inc., sought a certificate of public convenience and necessity to carry certain materials including dolomite, sand, phosphatic sand, clay and crushed rock. After an extensive hearing the Commission granted the applicant authority to transport some commodities but declined jurisdiction of the carriage of dolomite, sand, phosphatic sand, clay and crushed rock, on the theory that they were the kind of materials or products that had been excluded from the operation of the act because of their characteristics and that they could, therefore, be transported without obtaining authority of the Commission.
Specifically, the Commission found that transportation of the materials in question from the point of production to the point of primary manufacture was exempt. Originally, ground phosphate rock and insecticides were included in the application to the Commission. No question is now raised about the transportation of these because of their nature, but only about the exclusiveness of the use of vehicles to transport them. In this classification, dolomite was also placed when delivered direct to the consumer for use as fertilizer. These three items were, therefore, affected by the provisions of the third paragraph of the section, already quoted, which was the amendment enacted in 1937.
With reference to sand and phosphatic sand it was observed that when these products are moved from the “point of production,” pit, to the fertilizer plant, “point of primary manufacture,” they are incorporated in fertilizer. Clay was said by the Commission to be taken from the clay pit, “point of production,” to the kiln, “point of primary manufacture,” to be made into tile. Crushed rock was stated to move from the place where mined and crushed, “point of production,” to “an asphalt road mix manufacturing plant,” point of “primary manufacture,” to be mixed with hot or cold asphalt for use in road building. Dolomite, when not delivered direct to the consumer, was said to move from the pit, “primary point of production,” to the plant, “primary point of manufacture” for conversion into fertilizer.
It is plain from the findings and repeated references to points of production and primary manufacture that it was thought by the Commission the materials were either goods, wares and merchandise, or materials to which the adjectives “horticultural” and “agricultural” applied, because it is obvious that they could not fall in any of the other classifications detailed in the first paragraph of Sec. 323.29, supra.
Evidently the singular construction of the act in question grew out of an attempt to revise the original, Sec. 1(h) of Chapter 13700, Laws of Florida, Acts of 1929, after it was held unconstitutional in the case of Smith v. Cahoon, 283 U.S. 553, 51 S.Ct. 582, 75 L.Ed. 1264. See Riley v. Lawson, 106 Fla. 521, 143 So. 619.
In the amendatory act, Chapter 14764, supra, there appeared essentially the same exceptions but, perhaps to meet the observation of the Supreme Court of the United States with reference to discrimination between haulers of designated products and groceries, the words “goods, wares, merchandise” were inserted. The place in the law where they came to rest rendered the relevant part of the sentence extremely difficult of construction for it now applies to “motor vehicles while engaged exclusively in transporting goods, wares, merchandise, horticultural, agricultural”, then the language is turned to forest “products”, then to seafood and dairy “products”. We have italicized the adjectives for the second time because they have caused much argument in this case and have given us much concern. If *712 they are held to modify “goods, wares, merchandise” then, of course, we would have horticultural or agricultural goods, wares, and merchandise. If they are not so used they would simply dangle unless we supply the noun “products” which appeared in the original act, Chapter 13700, supra, but we cannot take the liberty of supplying a word. We are obligated to give meaning to all words chosen by the legislature. Snively Groves, Inc., v. Mayo, 135 Fla. 300, 184 So. 839. *In attempting to fulfill this obligation, we can only read this part of the act as if the adjectives precede the nouns we think they modify. Milam v. Davis, 97 Fla. 916, 123 So. 668.
The interpretation is made even more difficult when an attempt is made to apply the adjectives in the declaration, such as “casual”, “seasonal”, slow-moving and short-distanced to the kinds of transportation in question, much less to such carriage as that of school children, seafood, forest and dairy products and ordinary goods, wares and merchandise.
The references to points of production and assembly or manufacture, and to “agricultural or horticultural products, supplies and materials, including fertilizers and sprays” in that part of the act added in 1937, would lead us to the belief that it was intended to except from the Commission’s regulations vehicles used in developing and harvesting products of the soil and waters of the state, in addition to the operation of busses and taxicabs under certain conditions, were it not for failure to mention such a purpose in the preface. Whether or not the injection into the law of the language relating to goods, wares and merchandise was sufficient to rescue it from invalidity we do not determine because no attack is now made upon its constitutionality.
Confusing and frustrating as the phraseology of the pertinent section is we cannot understand how the carriage of dolomite, sand, phosphatic sand, clay and crushed rock can be said accurately to fall in any of the categories detailed in the first paragraph of Sec. 323.29, supra. By any accepted definitions of these materials they are not horticultural or agricultural; they certainly have no connection with the seafood, forest or dairy industries.
We think the products are not goods, wares and merchandise as specified in the act bringing into play the provisions relative to removal from point of production to point of assembly or primary manufacture. We cannot accept the argument of the respondents that the term “goods, wares, and merchandise” includes “any personal property sold in trade,” or that the wording of the exemption makes it “clear the goods, wares and merchandise moving from a point of production to a point of primary manufacture or to an assembly point must be raw materials.” We do not think these substances may be so described.
We have construed the difficult language of the first paragraph of the section as limiting its application to “agricultural” and “horticultural” goods, wares and merchandise. This we think is more logical than the argument the respondents advance that goods, wares and merchandise are, at once, all property sold in trade and only raw materials moving from point of production to point of primary manufacture or assembly.
It is our view that the transportation of dolomite, alone, of the products in question, is within the excluded jurisdiction and then only when the vehicles employed are used exclusively to take it from the place where it is mined to the consumer or grower. And in making this statement we do not purpose to adopt the restricted definition of the word “exclusively” for which the petitioners contend. It would not, in our opinion, be fair or sensible to hold that a vehicle used to transport an occasional load of dolomite from the mine to the grower or consumer would have to remain idle when not actually put to such use. We concur in the interpretation of the Commission that when a vehicle at any given time is employed in carrying dolomite on such a *713 trip the load must consist entirely of dolomite or dolomite and other exempt materials.
We do not consider that all qualifications in the preface of the act must be met before any exemptions are effective.
The writ of certiorari is granted and the respondents are directed to revise that part of their order which is inconsistent with the views we have expressed.
TERRELL, C. J., and HOBSON, THORNAL and O’CONNELL, JJ., concur.