LAWSON, J.,
dissenting.
I respectfully dissent because I do not believe that binding legal precedent and the statutes we must follow permit the result reached by the majority. In explaining my reasons for reaching this conclusion, I will first discuss legal principles about which the majority and I seem to agree. The majority dismisses the cases setting forth these principles as distinguishable, and I generally agree with that characterization as well. But, because these principles frame the legal issue in this case, I believe it important to a clear legal analysis to have them firmly in mind before proceeding further. Next, I will explain why I believe the majority misses the mark in its analysis of the controlling statute in this case, section 742.14, Florida Statutes (2008), both in terms of the law constraining our appellate review and in its construction of the statute itself. Finally, I will explain what I see as the flaws in the majority’s constitutional analysis and explain why we should not reach the constitutional issue which the majority ultimately relies upon to reach its desired result.

I. Facts and Legal Principles Framing the Issue in this Case

A. The Birth Mother is the Natural (and Legal) Mother of the Child.
At common law, the birth mother was presumed to be the sole legal mother of the child. In re Adoption of Sebastian, 25 Misc.3d 567, 569, 879 N.Y.S.2d 677, 679 (N.Y.Sur.2009) (“At common law, parentage derived from two events, a child’s birth to its ‘mother,’ and the mother’s marriage to a man. Children born out-of-wedlock had only one legal parent, their birth mother.”) (footnote omitted); In re C.K.G., 173 S.W.3d 714, 729 (Tenn.2005) (“The common law presumed that the birth mother is the legal mother of the child.”) (citation omitted);[14] As such, this rule was adopted as Florida common law by virtue of section 2.10, Florida Statutes, cf. Gossett v. Ullendorff, 114 Fla. 159, 154 So. 177 (1934) (recognizing that a “wife is *806 not permitted to deny the parentage of children born during wedlock” because “maternity is never uncertain”), and remains the law of Florida until abandoned or altered. See, e.g., Choctawhatchee Elec. Co-op., Inc. v. Major Realty Co., 161 So.2d 837, 839 (Fla. 1st DCA 1964) (“Common law principles continue to prevail in Florida unless modified by statute”). Courts must observe the common law when it is plainly stated. Duval v. Thomas, 114 So.2d 791, 795 (Fla.1959).
Florida’s statutory scheme also recognizes the birth mother as the legal mother of the child to whom she gave birth. As both parties acknowledge, this is clear from chapter 382, Florida Statutes. That chapter requires that a certificate of live birth be filed with the state “for each live birth that occurs in this state” within “5 days after such live birth .... ” § 382.013(l)(a), Fla. Stat. (2004). Section 382.013(l)(g) requires that the child’s birth mother be listed as the legal parent, regardless “of any plan to place a child for adoption after birth.... ” The definition of “live birth” in section 382.002(9), Florida Statutes, also makes clear that Florida law recognizes the birth mother as the natural and legal mother of the child to whom she gave birth. Id. (“ ‘Live birth’ means the complete expulsion or extraction of a product of human conception from its mother, irrespective of the duration of pregnancy ....”) (emphasis added); see also § 63.032(12), Fla. Stat. (2008) (“ ‘[Pjarenfi means a woman who gives birth to a child or .... the adoptive mother....”).
Accordingly, under both common law and Florida’s statutory law, Appellee, D.M.T., is the natural and legal mother of the child. The majority appears to accept this conclusion insofar as it does not suggest that Appellee can be divested of her legal status as the mother of the child.[15] However, neither Appellant nor the majority appear to fully appreciate the legal implications of this conclusion.
First, both Appellant and the majority use the term “biological mother” to describe Appellant. Yet, it is Appellee, not Appellant, who is the natural and legal mother of the child. The issue in this case is whether there is any legal basis on which Appellant can also claim parental rights. At best, it confuses this issue to call Appellant the “mother” from the outset — a term with clear legal implications *807 that seems to presume the outcome of the case beginning with the second sentence of the majority’s opinion. I would also note that both the genetic and gestational roles in bringing this child into the world are “biological” processes. A fertilized egg[16] grew inside of Appellee’s uterus, nourished and protected by Appellee’s body for approximately nine months, in a biological process. Because both Appellant and Ap-pellee have a “biological” connection with the child, it confuses matters to label Appellant’s role as biological.
Second, as the natural and legal mother of the child, D.M.T. enjoys protection under both the United States Constitution and the Florida Constitution against interference with her parental rights. See Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (“The liberty interest at issue in this case — the interest of parents in the care, custody, and control of their children — is perhaps the oldest of the fundamental liberty interests recognized by this Court.”); Heart of Adoptions, Inc. v. J.A., 963 So.2d 189, 206 (Fla.2007) (Lewis, C.J., concurring in result only) (“The interest of a parent in the upbringing of his or her children has been acknowledged by this Court as a fundamental liberty interest under the Florida right to privacy.”) (citing Beagle v. Beagle, 678 So.2d 1271, 1275 (Fla.1996)). Normally, when courts address an attempt to force a parent to allow visitation with his or her child, the first question to be addressed is whether the constitution will allow the courts to interfere with the parent’s fundamental rights. And, Appellee has consistently pled and argued her constitutional rights as the legal mother of the child in this case, in defense of Appellant’s causes of action. But, no such analysis appears in the arguments presented by Appellant, nor in the majority’s opinion.
Finally, given the common law starting point for analysis, if the majority is going to create a new common law rule to account for scientific advances not contemplated at the time the common law rule came into being, it should at least acknowledge that this is what it is doing, address the serious and complex policy implications of doing so, and set forth exactly what new common law rule will now govern cases in this arena.
B. Florida Law Does Not Support a Claim for Parental Rights as a “Psychological” or “De Facto” Parent.
Florida’s appellate courts have consistently held that parental rights cannot be extended or established based upon the emotional or psychological bond that develops over time when one treats a child as his or her own, even with the legal parents’ knowledge and consent. E.g., Wakeman v. Dixon, 921 So.2d 669 (Fla. 1st DCA 2006) (rejecting former domestic partner’s claim of parental rights as a “de facto” or “psychological” parent as there is “no right to claim court-ordered visitation as a ‘psychological parent,’ and the court lacks the inherent authority to award it”); Lamaritata v. Lucas, 823 So.2d 316, 319 (Fla. 2d DCA 2002) (noting several cases holding that nonparents are not entitled to visitation); Kazmierazak v. Query, 736 So.2d 106 (Fla. 4th DCA 1999) (rejecting claim of visitation rights by “psychological parent,” and discussing in detail Florida statutes under which a non-parent may petition for custody or visitation); Music v. Rachford, 654 So.2d 1234 (Fla. 1st DCA 1995) (rejecting former lesbian partner’s claim for child *808 visitation and shared parental responsibility based on status as “de facto” parent); Taylor v. Kennedy, 649 So.2d 270 (Fla. 5th DCA 1994) (prohibiting trial court from acting on “psychological father’s” request for visitation with child who he had lived with for six years, and treated as his own child while living with child’s mother, as there is “no right to claim court-ordered visitation as a ‘psychological parent,’ and the court lacks the inherent authority to award it”) (citations omitted).[17]
The majority neither suggests that we should recede from our own precedent on this issue, nor certifies conflict with the many cases from other district courts applying this precedent. Additionally, the majority does not indicate that it is in any way granting relief based upon Appellant’s claim that section 742.14, Florida Statutes, is unconstitutional in that it infringes on her “right to privacy” by denying her “the right to parent a child for whom she is a de facto parent.” Therefore, although the majority opinion emphasizes the facts demonstrating the emotional or psychological bond that Appellant developed with the child, it is important to note that these bonds do not form a basis for extending parental rights to Appellant under well-established Florida law, and do not form the basis for any constitutional challenge to section 742.14.
C. Florida Law Does Not Support a Claim for Parental Rights Based Upon a Legal Parent’s Agreement to Extend Those Rights to Another.
Florida’s appellate courts have also consistently held that-“‘agreements granting visitation rights to a non-parent are unenforceable.’ ” Wakeman, 921 So.2d at 673 (quoting Lamaritata, 823 So.2d at 319); Taylor, 649 So.2d at 271-72 (“Florida courts do not recognize a claim for specific performance of a contract for visitation in favor of a non-parent.”). Lamaritata is particularly instructive. In that case, the Second District applied this principle to a case in which the mother of a child contractually promised a sperm donor that she would grant visitation rights to the man if she conceived and bore a child from the sperm that he donated. The court flatly rejected the man’s claims for visitation or other parental rights based upon this agreement, holding that:
[A] sperm donor is a nonparent, a statutory stranger to the children. Even though the parties entered into ... stipulations, purportedly to give visitation rights to this nonparent ... that agreement is not enforceable.
Lamaritata, 823 So.2d at 319 (citations omitted).
Again, the majority does not take issue with this well-settled law, does not suggest that our court should recede from Taylor, and does not certify conflict with any case applying this law. Therefore, although the majority opinion discusses the fact that Appellee agreed to share parental rights with Appellant, it is important to note that the majority does not rely upon this agreement as the basis for extending parental rights to Appellant.
D. Appellant’s Claim to Parental Rights is Based Upon Her Genetic Role, or Egg Donation to Ap-pellee.
This brings us to a final, essential point of agreement that I share with the majori *809 ty. That is, if Appellant does have a claim of parental rights to Appellee’s child, it must be by virtue of her genetic link to the child, i.e., by virtue of her egg donation.

II. Section 742.14, Florida Statutes.

A. Section 742.14, Florida Statutes, Clearly and Unambiguously Bars Appellant’s Parentage Claim Based Upon Her Egg Donation.
According to the majority, “there is nothing in chapter 742, and specifically section 742.14, that addresses” the issue we must resolve. This is the point on which I respectfully but most strongly disagree with the majority. The issue, again, is whether Appellant can claim parental rights based upon her genetic link to the child, brought about by her egg donation. Section 742.14, Florida Statutes (2008), provides that:
[T]he donor of any egg, sperm, or preembryo ... shall relinquish all maternal or paternal rights and obligations with respect to the donation or the resulting children.[18]
The statute offers only two exceptions, and Appellant concedes that she does not qualify for either.[19] As such, Appellant effectively concedes that section 742.14, by its plain language, bars her claim. See Holly v. Auld, 450 So.2d 217, 219 (Fla.1984) (“[wjhen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.”) (quoting A.R. Douglass, Inc. v. McRainey, 102 Fla. 1141, 137 So. 157, 159 (1931)). In my view, the statute could not have been drafted any more clearly. That was the trial court’s conclusion as well.
However, the majority sidesteps section 742.14 by interpreting the word “donor” in a manner so as to not encompass Appellant. Citing to the California Supreme Court’s decision in K.M. v. E.G., 37 Cal.4th 130, 33 Cal.Rptr.3d 61, 117 P.3d 673 (2005), the majority concludes that Appellant is not a “donor ... because she did not intend to give her ova away ... [but] intended to be a mother to the child born from her ova....” In my view, the term “donor” in this statute can only be reasonably read to mean one who uses assisted reproductive technology to provide his or her genetic material to another. Under this definition, the subjective intent of the “donor” is irrelevant. The majority’s construction of the term “donor” — as a person who provides genetic material to another with the intent of abandoning any claim of parental rights — cannot survive scrutiny for a number of reasons.
B. A Reversal Based upon the Majority’s Construction of the Term “Donor” Violates Principles of Appellate Review.
It is axiomatic that: “In order to be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved.” Tillman v. State, 471 So.2d 32, 35 (Fla.1985). Appellant in this case never argued to the *810 trial court that she was not an egg “donor,” as that term is used in section 742.14, Florida Statutes, or that the term “donor” has the special meaning attributed to it by the majority. It is generally inappropriate to reverse a trial judge based upon an argument never presented to the judge. Id. In this case, the issue is further barred from consideration in that Appellant never made the argument on appeal either. Cf. Hall v. State, 823 So.2d 757 (Fla.2002) (recognizing an appellant’s failure to make an argument in an initial brief acts as a procedural bar to consideration of the issue on appeal). Rather, on appeal as before the trial court, Appellant accepted that she was a “donor,” as that term is used in section 742.14. For this reason alone, we should not reverse the final judgment before us based upon the majority’s definition of the term “donor.”
C. The Majority’s Construction of the Term “Donor” is Erroneous Because it is Inconsistent with the Universal Use of the Term in this Context.
In medical science, the procedure by which an egg is removed from one person, to be fertilized and transferred to another person is called “donation.” See Coleman, supra, at 502; Brenda Reddix-Smalls, Assessing the Market for Human Reproductive Tissue Availability: Why Can We Sell Our Eggs But Not Our Livers, 10 Vand. J. Ent. & Tech. L. 643, 651 n. 22 (2008); Kenneth Baum, Golden Eggs: Towards the Rational Regulation of Oocyte Donation, 2001 B.Y.U. L.Rev. 107,108 n. 5 (“Traditionally, the word ‘donation’ refers to the altruistic act of voluntarily giving a good or service without requesting or receiving any valuable consideration in return. Here, by contrast, the assisted reproduction profession, and society at large, has misapplied that term to a situation in which the ‘donor’ expects and receives valuable consideration. It is a misnomer but one that has become entrenched in popular diction and one that I will adopt throughout this article.”). The woman from whom the egg is removed is called the “donor,” and the person to whom the fertilized egg is ultimately transferred is called the “recipient.” Id. These terms are used even when the donor is paid for the egg, and irrespective of why the donation is made. Id.; see also Nicole L. Parness, Forcing a Square into a Circle: Why are Courts Straining to Apply the Uniform Parentage Act to Gay Couples and Their Children? 27 Whittier L.Rev. 893, 895 (2006) (discussing case in which lesbian partner “only agreed to donate her eggs because she and [her partner] had agreed that they would raise the child together [with both as parents]”) (emphasis added); Ralph C. Brashier, Children and Inheritance in the Nontraditional Family 1996 Utah L.Rev. 93, 200 n. 368 (1996) (discussing “lesbian couples, one of whom donates her egg to be gestated by her partner with the intent that both shall rear the child”) (emphasis added); Dana Shilling, Lawyer’s Desk Book, Aspen Publishers § 16.10 Adoption at pp. 16-47 (2011) (discussing “woman whose donated egg was fertilized and implanted in her same-sex partner (they were married in Holland) ... [who] filed for adoption to safeguard her parental rights”) (emphasis added); William Bassett, California Community Property Law s. 2.22 n. 12 (Domestic partnerships registration) (2011 ed.) (discussing California case and explaining that “[t]he donor did not intend simply to donate her eggs, but rather designated her donation so that her partner could give birth to a child who would be raised in their joint home.”) (emphasis added); cf. Katheryn D. Katz, The Legal Status of the Ex Utero Embryo: Implications for Adoption Law, 35 Cap. U.L.Rev. 303, 340 (2006) (“The term ‘hu *811 man sperm donor’ is something of a misnomer, as in many cases the sperm contributor is the woman’s husband or partner.”). Not surprisingly, these same terms have been adopted and used in the same way in the legal community when addressing this topic. See, e.g., E.E. v. O.M.G.R., 420 N.J.Super. 283, 20 A.3d 1171 (2011); In re Adoption of Sebastian, 25 Misc.3d 567, 879 N.Y.S.2d 677 (N.Y.Sur.Ct.2009); In re C.K.G., 173 S.W.3d 714 (Tenn.2005); McIntyre v. Crouch, 98 Or.App. 462, 780 P.2d 239 (1989).
The only authority cited by the majority in connection with its definition of the term “donor” is the California Supreme Court case of K.M. v. E.G., 37 Cal.4th 130, 33 Cal.Rptr.3d 61, 117 P.3d 673 (2005). The majority states that K.M. is a case with “facts similar to” our case, and says that the K.M. court “held that a lesbian woman who provided her ova to her lesbian partner was not a donor of her ova.” Contrary to the majority’s assertion, KM. had nothing to do with defining the word “donor.” The court ultimately did rule that the egg donor in that case had parental rights based upon her genetic link to the child. But, it did so based upon its reading of California’s version of the Uniform Parentage Act (“UPA”), id. at 681 n. 6 (“We simply follow the dictates of the UPA.”), which does not contain any language similar to section 742.14, Florida Statutes, barring an egg donor from claiming parental rights based upon her donation.
Significantly, the KM. court used the terms donor, donate, and donation throughout the opinion to describe K.M.’s genetic contribution in that case. Id. at 675 (“ ‘[s]he donated her egg to respondent’ ... KM. ‘explicitly donated her ovum under a clear written agreement by which she relinquished any claim to offspring born of her donation’ ”) (quoting the lower court); id. at 676 (“E.G. then asked K.M. to donate her ova”); id. (“K.M. was the ova donor.”); id. (“she was the ova donor”); id. (“she would not have donated her ova had she known E.G. intended to be the sole parent”); id. (“neither E.G. nor K.M. told anyone K.M. had donated the ova”); id. at 679 (“ ‘the donation of her ova ... her ovum donation .... agreed in advance of the ovum donation .... donating genetic material’ ”) (quoting lower court); id. at 139, 33 Cal.Rptr.3d 61, 117 P.3d 673 (“KM. donated her ova to E.G.”). In fact, the KM. court held that under California’s version of the UPA, an egg donor’s intent to parent any offspring resulting from her donation was irrelevant to her parentage claim. Id. at 682 (“whether there is evidence of a parent and child relationship under the UPA does not depend upon the intent of the parent”). The KM. court rejected a parentage determination based upon the donor’s subjective intent, in part, because “the intent test would rest the determination of parentage upon a later judicial determination of intent made years after the birth of the child.” Id. In short, KM. does not in any way support the majority’s interpretation of the word “donor” in this context.
In fact, I have not found any judicial opinion or scholarly writing which defines the term “donor,” in this context, in the novel way that the majority has in this case. Sometimes, when an author is discussing a person who provides genetic material with the intention of relinquishing his or her rights to the material (or any resulting child), the author will use a qualifying phrase such as “anonymous” donor, see, e.g., Erin Y. Hisano, Gestational Surrogacy Maternity Disputes: Refocusing on the Child, 15 Lewis & Clark L.Rev. 517, 519 (2011), “true” donor, see, e.g., Meghan Anderson, K.M. v. E.G.: Blurring the Lines of Parentage in the Modem Courts, 75 U. Cin. L.Rev. 275, 292 (2006), “third-party” donor, see, e.g., Kerry Lynn Mein- *812 tosh, Brave New Eugenics: Regulating Assisted Reproductive Technologies in the Name of Better Babies, 2010 U. Ill. J.L. Tech. & Pol’y 257, 265 n. 66 (2010), or “mere” donor, see, e.g., Charles P. Kindre-gan, Jr., Collaborative Reproduction and Rethinking Parentage, 21 J. Am. Acad. Matrim. Law, 43, 48 (2008). This is necessary because the term “donor” in this context universally encompasses anyone who provides genetic material for use by another.
In this case, as in all cases, we should not apply an extraordinary or novel definition to a word in a statute that has a readily apparent common usage in context. State v. Brake, 796 So.2d 522, 528 (Fla.2001) (“[W]here a statute does not specifically define words of common usage, such words are construed in their plain and ordinary sense.”) (citing State v. Mitro, 700 So.2d 643, 645 (Fla.1997)). The majority fails to explain the source from which it has derived its novel definition. It certainly is not, as already discussed, from any argument presented below or on appeal. And, it does not appear to come from any authoritative writing in the medical, scientific or legal community regarding this subject. It is error, in my view, to apply a novel definition of our own creation to a word in a statute that has a universally recognized common meaning in connection with the subject addressed in the statute.
I also believe that if the Florida Legislature had wanted to consider such factors as a donor’s subjective intent, a private contract regarding parental rights, or even a person’s status as a “de facto” or psychological parent, it certainly could have done so, as other states and jurisdictions have. See, e.g., Del.Code Ann. tit. 13, § 8-703 (2010) (“A man who provides sperm for, or consents to, assisted reproduction by a woman ... with intent to be the parent of her child, is a parent of the resulting child.”); N.J. Stat. Ann. § 9:17-44 (West 2010) (“Unless the donor of semen and the woman have entered into a written contract to the contrary, the donor of semen ... is treated in law as if he were not the father of a child thereby conceived and shall have no rights or duties stemming from the conception of a child.”); D.C.Code § 16-909(a-1)(2) (2010) (“There shall be a presumption that a woman is the mother of a child if she and the child’s mother are or have been married, or in a domestic partnership, at the time of either conception or birth, or between conception or birth, and the child is born during the marriage or domestic partnership.... ”). Where the legislature could have chosen to write a statute a different way, but did not do so, courts cannot disregard language the legislature chose to use, Regency Towers Owners Association v. Pettigrew, 436 So.2d 266, 268 (Fla. 1st DCA 1983), or add additional terms, Atlantic Coast Line Railroad Company v. Boyd, 102 So.2d 709, 712 (Fla.1958).
D. The Majority’s Construction of the Term “Donor” is Erroneous Because it Renders the Statutory Exceptions Meaningless.
“It is an elementary principle of statutory construction that significance and effect must be given to every word, phrase, sentence, and part of the statute if possible, and words in a statute should not be construed as mere surplusage.” Hechtman v. Nations Title Ins., 840 So.2d 993, 996 (Fla.2003). Further, “a basic rule of statutory construction provides that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless.” State v. Goode, 830 So.2d 817, 824 (Fla.2002).
After broadly barring any egg or sperm donor from claiming parental rights to a *813 child resulting from the donation, section 742.14 sets forth two narrow exceptions. The first allows a sperm donor to claim parental rights based upon his genetic connection to the resulting child if he “executed a preplanned adoption agreement under s. 63.212,” Florida Statutes. Clearly, a man who provides sperm pursuant to a preplanned adoption agreement had no subjective intent to relinquish control of his sperm or any child conceived from his sperm. So, applying the majority’s definition of “donor,” the bar of section 742.14 would never have applied to the man in the first place. It makes no sense to suggest that the legislature would have enacted this exemption if it had intended the word “donor” to have the meaning attributed to it by the majority, because the exemption will never apply to anyone. It is meaningless. Unnecessary. Surplusage. The same is true of the other statutory exception for a “commissioning couple.” Under the majority’s definition, the couple are not “donors” because they intend to parent any resulting child, and the exception that allows them to make a parentage claim is unnecessary surplusage. Because it is improper to construe a statute in a manner that renders part of the enactment meaningless, Hechtman, 840 So.2d at 996; Goode, 830 So.2d at 824, the majority’s definition of the word “donor” is erroneous.
E. The Majority’s Construction of the Term “Donor” is Erroneous Because it Defeats the Clear Purpose of the Statute.
“[Statutory enactments are to be interpreted so as to accomplish rather than defeat their purpose.” Reeves v. State, 957 So.2d 625, 629 (Fla.2007) (quoting Lewis v. Mosley, 204 So.2d 197, 201 (Fla.1967)). In very plain terms, section 742.14 prohibits a person from providing an egg or sperm for use by another, and then claiming parental rights to any resulting children, with two narrow exceptions. It seems obvious to me, at least, that the reason this statute was enacted is to narrowly limit those circumstances in which a person who provides genetic material to another using assisted reproductive technology can claim parental rights in a resulting child. A likely secondary purpose is to provide certainty when it comes to parentage claims based upon the use of assisted reproductive technology. The majority’s construction of the term “donor” defeats both purposes.
First, the majority’s construction places no limit whatsoever on the ability of a provider of genetic material to attempt to assert parental rights. Again, a “donor,” according to the majority, appears to be a person who provides genetic material to another with a subjective intent to relinquish parental rights with respect to any child conceived using his or her genetic material. But, anyone could make an after-the-fact claim that he or she donated genetic material with the intent of parenting any resulting child. It is worth noting that the Appellant in this case signed an informed consent form which stated in plain terms that she would not be claiming parental rights as a result of her donation. The form was drafted broadly to cover situations in which the “donor” knew the planned recipient. The form itself repeatedly uses the term “donor” to describe Appellant’s role, and Appellant signed on the line labeled for the “Donor’s Signature.”[20] There can be no question but that Appellant understood from this form that her role in the medical procedure was that of the “donor.” And, the form stated:
*814 I, the undersigned, forever hereafter relinquish any claim to, or jurisdiction over the offspring that might result from this donation and waive any and all rights to future consent, notice, or consultation regarding such donation. I agree that the recipient may regard the donated egg as her own and any offspring resulting there from as her own children.
The majority is probably correct that this language did not reflect Appellant’s true subjective intentions in this case. However, perhaps recognizing that the form she signed forever relinquishing any claim of parental rights was unambiguous, Appellant contends on appeal (as she did below) that a factual dispute exists regarding her true intentions regarding the donation. Accordingly, Appellant argues that we should remand with directions that the trial court conduct an evidentiary hearing to resolve the dispute, not that we resolve the dispute in her favor.
Setting this issue aside, however, I cannot help but wonder whether the majority truly appreciates the uncertainty it has created with its holding for infertile women who have used assisted reproductive technology thinking that they would be protected as the sole legal mother of then* children. The majority opinion can only be read as standing for the proposition that even where a donor has signed a form similar to the one signed by Appellant in connection with her donation, that person can still seek to establish a parentage claim at some future date based upon her subjective intent to do so. Although it seems clear on this record that both Appellant and Appellee understood Appellant’s subjective intent at the time of the donation, there is nothing in the majority’s analysis that would prohibit others from bringing a similar claim in which the issue of a donor’s subjective intention is hotly contested — as was the case in KM. (the California case). In KM., the donor testified that she intended to parent any resulting child and the recipient testified that she would never have accepted the donation under those conditions, but that she and the donor had agreed that only she (the recipient) would have parental rights. Disputes like this, creating uncertainty where the legislature seems to have intended to assure certainty, are likely in the future under the majority’s construction of the statute.
In short, if I am correct as to the purposes behind section 742.14, the majority’s construction is erroneous because it defeats the statute’s purposes. Reeves, 957 So.2d at 629. If I am incorrect about the statute’s purposes, one is left to wonder why the legislature would have bothered enacting the statute at all. Under the majority’s analysis, a person can donate an egg or sperm and claim parental rights, if that is what he or she subjectively wants; or, can disclaim parental obligations based upon his or her donated egg or sperm, if that is what he or she subjectively wants. To me, that renders the entire statute something of an absurdity in that it accomplishes nothing.
*815 Of course, Appellant never argued for this extraordinary reading of section 742.14. Rather, she accepted that the statute by its plain terms barred her claim of parental rights based upon her egg donation. That is why the only real issue, as framed by Appellant’s pleadings below, was her claim that this statute is unconstitutional — which I will address next.
III. Constitutional Issues.
As a fail-back position, the majority concludes that if Appellant is an egg “donor,” as that term is used in section 742.14, then the statute still cannot be applied to bar her parentage claim because it is unconstitutional. As a preliminary matter, it is not clear to me why Appellant and the majority believe that avoiding section 742.14 will automatically result in a legal finding that she is entitled to parental rights. Normally, if no statute applies to a subject, we would resort to common law to decide the legal question. As already discussed: “The common law presumes that the birth mother is the legal mother of the child. Unless the rule has been modified by statute, the presumption resolves disputes between the genetic mother and the gestational mother.” Coleman, supra, at 524 (footnotes omitted). Again, the majority does not suggest that it is modifying the common law rule, or what new rule of law it is announcing. Setting this issue aside, however, section 742.14 should not be declared unconstitutional because Appellant has demonstrated no basis to do so.
A. Appellant Has Neither Demonstrated Any Basis on Which to Declare Section 742.14 Unconstitutional Nor Preserved Any Constitutional Argument for Review.
“A statute is presumed constitutional ... [and the] party challenging a statute has the burden of establishing its invalidity.” Peoples Bank of Indian River Cnty. v. State, Dep’t of Banking and Fin., 395 So.2d 521, 524 (Fla.1981) (citations omitted). In her complaint, Appellant alleged that section 742.14 violated her rights under the Equal Protection Clauses of the United States and Florida Constitutions,[21] and that it infringed upon her right to privacy under the Florida Constitution.[22] However, the record does not reflect that Appellant ever advanced any coherent legal theory, analysis or argument in support of these constitutional claims. As such, there is no basis to reverse the trial court’s order based upon a constitutional challenge to section 742.14. Id.; see also Newell v. State, 875 So.2d 747, 748 (Fla. 2d DCA 2004) (reciting general rule that the party challenging a statute has the burden of establishing its invalidity, and rejecting without analysis constitutional challenge to statute where “conclusory argument demonstrate[d] no basis for reversal”); Perez v. State, 919 So.2d 347, 359 (Fla.2005) (holding that in order to preserve an issue for appeal, the issue “ ‘must be presented to the lower court and the specific legal argument or ground to be argued on appeal must be part of that presentation’ ”) (quoting Archer v. State, 613 So.2d 446, 448 (Fla.1993), cert. denied,, 519 U.S. 876, 117 S.Ct. 197, 136 L.Ed.2d 134 (1996)).
The majority dismisses this point, stating that Appellant “specifically pled in her complaint that section 742.14 is unconstitutional, and it was adequately argued in the trial court .... ” (emphasis added). To be crystal clear, the record below contains absolutely no argument from Appellant in support of the three paragraphs in her complaint challenging the constitution *816 ality of section 742.14. As for the complaint itself, Appellant alleged only an “as-applied” challenge to section 742.14 on privacy grounds. See generally 16 Am.Jur.2d Constitutional Law § 132 (updated August 2011) (“A court should not rule that a statute is unconstitutional as applied to a particular case until a complete record has been developed.”); Cantor v. Davis, 489 So.2d 18 (Fla.1986) (“Prudence dictates that issues such as the constitutionality of a statute’s application to specific facts should normally be considered at the trial level to assure that such issues are not later deemed waived.”).
Even on appeal, Appellant does not offer any recognizable constitutional analysis in support of her bald assertion that the statute is unconstitutional.[23] Appellant filed a twenty-four page initial brief (including the cover page, table of contents, table of citations, and signature page), and no reply brief. Of the eleven and one-half pages of argument, approximately four pages at least loosely relate to her constitutional claims. But, her argument — if you can call it that — consists of conclusory statements that: (1) as the biological mother she enjoys “the fundamental right to parent” her child and a “right to procreate”; (2) that this constitutes a facial challenge to the statutes presenting a “mixed question of fact and law” on which “the parties need to present evidence”; (3) that “the trial court had the duty to conduct an evidentiary hearing to determine if § 742.14 was constitutionally and facially applicable”; (4) that we should remand for the trial court to consider the “detriment to the child” at an evidentiary hearing;[24] (5) that a “‘serious procedural problem’ arises when the parties attempt to resolve the issue of the constitutionality of a statute on summary judgment,” quoting Department of Health & Rehabilitative Services v. Cox, 627 So.2d 1210, 1212 (Fla. 2d DCA 1993), approved in part and quashed in part, 656 So.2d 902 (Fla.1995) (holding that the record from the trial court was insufficient to determine a constitutional challenge to section 63.042(3), Florida Statutes); (6) that “to the extent that Chapters 742 and 382 are interpreted as creating or denying parental rights, such issue cannot be resolved, as a matter of law, from the record”; and (7) that “summary judgment should be reversed and the case remanded for further proceedings.” In other words, Appellant never argued that we should declare the statute facially unconstitutional on appeal, but that we should remand so that she could present evidence and argument in support of the constitutional challenge raised in the complaint. As to these arguments, however, the record does not reflect that Appellant ever sought an evi-dentiary hearing on her constitutional contention or argued to the trial court that summary judgment should be denied because these claims required an evidentiary hearing.
Just as it is improper to reverse the trial court based upon a statutory construction never advanced by Appellant, it is improper to reverse based upon a constitutional *817 argument that she never made. Tillman, 471 So.2d at 35; see also 16 Am.Jur.2d Constitutional Law § 132 (updated 2010) (“An appellant who fails to argue a constitutional contention in his or her brief, merely setting it forth in one sentence, is considered to have abandoned or waived such contention.... The burden of raising a constitutional question ... [includes a requirement that] the grounds outlining the basis of unconstitutionality must be particularized. The mere reference to a statute’s constitutionality, with nothing more, does not meet the standard of persuasion required to mount an attack on constitutional grounds.”) (footnotes and citations omitted).
B. The Majority’s Constitutional Analysis is Questionable.
Attempting to demonstrate a conclusion using a premise that assumes the conclusion as true is called “circular reasoning” or drculus in probando.[25] It is the primary means by which the majority attempts to demonstrate section 742.14 to be unconstitutional when it argues that “there can be no doubt that Appellant is a parent of the child and her parental rights must be accorded the full measure of protection provided by the Federal and Florida Constitutions.” [26] Again, the legal question in this case is whether Appellant can claim parental rights as a result of her egg donation. But, the majority starts its constitutional analysis by assuming that Appellant is a parent, and then applies the strict scrutiny test applicable to enactments that interfere with the fundamental right of a parent. Basically, the majority’s analysis is that because Appellant is a parent, the state cannot interfere with her parental rights. If there is a viable or debatable constitutional argument here, this is not it. See, e.g., In re Marriage of J.B. and H.B., 326 S.W.3d 654, 675 n. 9 (Tex.App.2010) (“In legal analysis, as in mathematics, it is fundamentally erroneous to assume the truth of the very thing to be proved.”) (citation omitted).
The majority also declares section 742.14 unconstitutional as violative of Appellant’s “fundamental” right “to procreate,” citing to Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (calling procreation “one of the basic civil rights of man”) and Grissom v. Dade County, 293 So.2d 59, 62 (Fla.1974) (which also cited Skinner for the proposition that “the right to legally have children and the right of marriage, although both statutorily created, have been held to be ‘basic civil rights of man’”). Of course, neither of these cases dealt with the use of assisted reproductive technology. In fact, neither case was decided based upon a theory of procreation as a fundamental right afforded heightened scrutiny under the Fourteenth Amendment.
The issue in Grissom, an adoption case, was whether statutes requiring prospective adoptive parents to bear the costs of *818 publishing notice of the adoption proceedings could be constitutionally applied to indigent persons who could not afford to pay the costs (effectively barring them from bringing an adoption proceeding in court). Skinner dealt with an Oklahoma statute providing for sterilization of individuals convicted of certain crimes, but not others. The majority of the court held that the statute violated the Equal Protection Clause as applied to Skinner. Id. at 541, 62 S.Ct. 1110 (“Sterilization of those who have thrice committed grand larceny with immunity for those who are embezzlers is a clear, pointed, unmistakable discrimination.”). In so holding, Justice Douglas, writing for the court’s majority, explained that: “Marriage and procreation are fundamental to the very existence and survival of the race.” Id. In short, Gris-som simply cited to the language in Skinner regarding a procreative right, and Skinner was addressing natural procreation (which involves both private, intimate, sexual contact between consenting adults and the control of one’s own body). This observation is significant to any analysis of later Supreme Court dicta in cases that actually address a constitutional right of privacy grounded in the Fourteenth Amendment’s Due Process Clause — which appears to be the basis of the majority’s holding in this case.
The threshold Fourteenth Amendment issue is whether the “fundamental right to procreate” is to be extended beyond natural procreation to now encompass a constitutional right to use assisted reproductive technologies (also discussed as “ARTs”); and, if so, whether that right extends to the use of that technology outside of one’s own body. This is an issue hotly debated among legal scholars, with absolutely no consensus having been reached. As explained in Andrew B. Coan, Assisted Reproductive Equality: An Institutional Analysis, 60 Case W. Res. L.Rev. 1143, 1146-47 (2010):
Most discussion of procreative liberty and ARTs has focused on substantive due process. In particular, the sharpest battle lines have been drawn over the question whether freedom to use ARTs qualifies as a fundamental liberty for purposes of due process analysis. There is ample ambiguity in the Supreme Court’s prior decisions to support significant debate. Most basically, the Court has never addressed the constitutionality of regulating ARTs. Indeed, it has squarely addressed the due process right to procreate — as opposed to the right not to procreate — only once, in the long since discredited Buck v. Bell. Nevertheless, there is substantial dicta in the Court’s due process decisions extolling “the right of the individual to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.” And, of course, as noted earlier, Skinner v. Oklahoma memorably described procreation as “one of the basic civil rights of man fundamental to the very existence and survival of the race.”
These statements would supply plausible precedential cover for the Court to recognize a broad right to procreative liberty extending to all manner of ARTs. But as most commentators have recognized, the cases hardly compel such a result. Attention has therefore turned to the normative question: Should the right to procreative liberty be interpreted as encompassing the use of some or all ARTs? Answers to this question have varied widely.
Id. at 1146-47 (footnotes omitted; empha *819 sis added);[27] see also McIntosh, supra, at 304 n. 388 (“Academic opinion is divided on the question of whether there is a constitutional right to procreate through ART”) (citations omitted); Molly O’Brien, An Intersection of Ethics and Law: The Frozen Embryo Dilemma and the Chilling Choice between Life and Death, 32 Whittier L.Rev. 171, 191 (2010) (“It is not clear whether the right to procreate extends to procreation via reproductive technologies.”) (footnote and citations omitted); Jennifer L. Rosato, The Children of ART (Assisted Reproductive Technology): Should the Laiv Protect Them from Harm,% 207 PLI/Crim 325, 340 (2006) (“There are a number of reasons to doubt whether the right to procreate extends far enough to encompass ART decisions.”).
For my analysis of this issue, I would begin with the Supreme Court opinions applying the “substantive due process” doctrine, which hold that the Due Process Clause prohibits states from infringing upon fundamental liberty interests, unless the infringement is narrowly tailored to serve a compelling state interest. See, e.g., Washington v. Glucksberg, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). The Supreme Court has repeatedly held that this heightened protection should only be applied to rights which are “objectively ‘deeply rooted in this Nation’s history and tradition,’ ” id. at 720-21, 117 S.Ct. 2258 (quoting Moore v. East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (plurality opinion)), and which are so “ ‘implicit in the concept of ordered liberty,’ [ ] that ‘neither liberty nor justice would exist if they were sacrificed!.]’ ” id. at 721, 117 S.Ct. 2258 (quoting Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). It is hard to see how the use of assisted reproductive technology meets this test.
Second, I would point out that the privacy cases to which the majority cites either deal with the government’s attempt to intrude upon private intimate conduct, see, e.g., Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (dealing with intimate and private human conduct, sexual behavior, in the most private of places, the home), or to regulate decisions regarding the use of one’s own body. See, e.g., Carey v. Population Servs., Int’l, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (dealing with a women’s right to bear a child, or not, in her own body). This case has nothing to do with either of these fundamental privacy interests. In fact, section 742.14 in no way limits Appellant’s opportunity to use assisted reproductive technology to conceive and bear her own child, in her own body. Rather, the majority appears to be creating a constitutional right to use a surrogate’s body for nine months to house and nurture one’s genetic child, as a means of becoming a parent. It is an interesting notion, which *820 raises even more interesting and complex questions. For example, what if the surrogate decides two months into the arrangement that she no longer wishes to bear a child? Does the genetic contributor then have a fundamental 'constitutional right to force the surrogate to carry the child to term? Or, is it the surrogate who enjoys this fundamental privacy right — to control her own body? The answer seems clear to me.
Third, I would point out that the majority’s strict scrutiny analysis founded upon a fundamental right of procreation still suffers from the logical fallacy that afflicts its pronouncement that section 742.14 interferes with Appellant’s fundamental rights as a parent. As explained in John Lawrence Hill, What Does it Mean to be a “Parent”? The Claims of Biology as the Basis for Parental Rights, 66 N.Y.U. L.Rev. 358 (1991):
[Ojnly a “parent” can exercise the right of procreation with respect to any particular child.... It follows that the application of the constitutional right of procreation depends upon an antecedent definitional conclusion regarding the meaning of parenthood.
Id. at 356 (footnotes omitted). In other words, simply saying that Appellant, or anyone else, has the right to procreate does not answer the question of who the law should favor when a parental rights dispute arises between individuals involved in an assisted reproductive technology arrangement. Each involved potential parent would be able to claim a fundamental right of procreation. And, we are dealing with technology that currently allows up to three women to reasonably claim rights as a mother (the intended mother, an egg donor, and a “surrogate” host); two men to reasonably claim rights as a father (the intended father and a sperm donor); and, “sixteen different reproductive combinations, in addition to traditional conception and childbirth.” Id. (“This total is the product of varying the source of the male gametes (whether by husband or third-party sperm donor), the source of the female gametes (whether by wife or third-party egg donor), the location of fertilization (whether in the wife, the laboratory, or the surrogate host), and the site of gestation (either in the wife or the surrogate).”); see also llana Hurwitz, Collaborative Reproduction: Finding the Child in the Maze of Legal Motherhood, 33 Conn. L.Rev. 127, 129 (2000) (“Collaborative reproduction presents the extraordinary possibility of up to three women claiming rights to legal motherhood. In a gestational surrogacy arrangement, with donor eggs, there may be three prospective maternal claimants: the intended mother, the gestational mother, and the genetic mother (the egg donor).”).[28] The majority in no *821 way addresses these concerns, but instead insists that we need not decide between the competing parentage claims in this case.
The problem with this pronouncement, when analyzed, is that it necessarily treats the most sweeping dicta from the Supreme Court’s substantive due process case law as binding precedent, with no recognition of the transformative implications of doing so. In Planned Parenthood v. Casey, 505 U.S. 833, 852, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), a Supreme Court plurality (of three justices) declared in flowing prose that:
[Matters] involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one’s own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.
At the end of the day, it is this principle that the majority must rely upon. Because, what the majority is really saying is that the Florida Legislature cannot dictate to a citizen that he or she live life constrained by the traditional notions of family implicit in Florida law. Section 742.14, consistent with the rest of Florida’s relevant statutory law, is drafted so that each child has only one legal mother and one legal father. Cf. Daniels v. Greenfield, 15 So.3d 908, 911(Fla. 4th DCA 2009) (“ ‘Florida does not recognize dual father-ship.’ ”)(quoting Achumba v. Neustein, 793 So.2d 1013, (Fla. 5th DCA 2001)); G.F.C. v. S.G. & D.G., 686 So.2d 1382, 1384 (Fla. 5th DCA 1997) (“[T]here is no such thing as dual fathership [under Florida law].”); 23 Fla. Prac., Florida Family Law § 6:5 (2011) (“a child cannot legally have two fathers or two mothers [under Florida law]”). And, Florida’s Constitution was amended in 2008 to add a provision reflecting the Florida electorate’s view of family as the traditional one. Fla. Const., Art. I, § 27 (“Inasmuch as marriage is the legal union of only one man and one woman as husband and wife, no other legal union that is treated as marriage or the substantial equivalent thereof shall be valid or recognized.”).
What the Casey dicta says, however, is that each person must be left free to choose for themselves how to order his or her life, guided by his or her individual “concept of existence, of meaning, of the universe, and of the mystery of human life.” There are a number of citizens who would choose to order their lives around various non-traditional concepts of family, if allowed by law. I do not see how we can say, on the one hand, that the government cannot prohibit Appellant from ordering her life in a family unit consisting of two legally recognized mothers — as a fundamental substantive due process right guaranteed by the Fourteenth Amendment— unless we are also willing to invalidate laws prohibiting same-sex marriage, bigamy, polygamy, or adult incestuous relationships on the same basis. See, e.g., Perry v. Schwarzenegger, 704 F.Supp.2d 921 (N.D.Cal.2010) (applying strict scrutiny based upon fundamental right to marry same-sex partner and invalidating provision in California constitution granting le *822 gal recognition only to marriage between a man and a woman as a violation of Due Process Clause of Fourteenth Amendment); but see, In re Marriage of J.B., 326 S.W.3d at 676 (disagreeing with Perry and holding that claimed right to marry a person of the same sex did not involve a fundamental right protected under the substantive due process doctrine). To me, these issues appear facially indistinguishable.
Fourth, I would point the majority to the cautionary warning given by the Supreme Court regarding expanding the substantive due process doctrine by recognizing new “fundamental rights.” In Glucksberg, the Court cautioned that courts should be “ ‘reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended.’” Id. at 720, 117 S.Ct. 2258 (quoting Collins v. Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). The Court further explained:
By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore “exercise the utmost care whenever we are asked to break new ground in this field,” lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court[.]
Id. (citations omitted). In my view, it is somewhat reckless to recognize the right of procreation through assisted reproductive technology without any real analysis, in a case where the issue was never raised below or briefed on appeal.[29]
Fifth, I would point out that invalidating section 742.14 as a violation of Appellant’s fundamental right to procreate (using ARTs) does effectively place the use of assisted reproductive technology “outside of the arena of public debate and legislative action.” To me, the question of parentage in the context of the voluntary use of assisted representative technology is the kind of difficult and controversial policy question that begs for legislation. See, e.g., Sorenson v. Secretary of Treasury of U.S, 475 U.S. 851, 865, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986) (“The ordering of competing social policies is a quintessentially legislative function.”); State v. Ashley, 701 So.2d 338 (Fla.1997) (“As we have said time and again, the making of social policy is a matter within the purview of the legislature — not this Court[.]”). Some states have addressed these difficult and controversial social policy questions by banning the use of assisted reproductive technology, and others have limited it, while many state legislatures have not addressed it at all. Mark Hansen, And Baby Makes Litigation, ABA Journal, March 201, at 53-55 (“The United States, unlike many countries, has no national policies governing assisted reproductive technology, including surrogacy. And state laws vary widely from one state to the next. Several states expressly prohibit it, declaring all such agreements void and unenforceable as a matter of public policy. A few even make it a crime to pay for surrogacy. Other *823 states allow it but restrict its use to married couples or to cases in which at least one of the intended parents has a genetic link to the child. And a handful of states have been very open to the use of reproductive technology and have allowed it to flourish. But a majority of states ... have no laws directly addressing surrogacy, leaving many such arrangements in legal limbo and raising a number of vexing social, legal and ethical issues involving parenthood.”). I do not see how any of the restrictions on the use of assisted reproductive technology, enacted by other states, could survive a constitutional challenge if procreation using assisted reproductive technology is recognized as a fundamental right.
Finally, I would note that the statute in question here is not directed just at men or women, heterosexuals or homosexuals, or any other narrow class. It places broad limits on the right of all citizens to make a parentage claim after donating genetic material to another. And, as previously noted, the statute does not bar Appellant (or any women, irrespective of sexual preference) from using assisted reproductive technology to conceive, bear and give birth to a child of her own, using her own body. This appears, at least on its face, to be a rational way to address this difficult social policy issue, irrespective of whether it reflects a policy choice that the majority or I would prefer, cf. McIntyre, 780 P.2d at 244 (rejecting argument that semen donation statute treating unmarried men and women differently violated state Equal Protection Clause because classifications were based on biological differences and were rationally related to purposes of the statute).
But, my main concern in attempting to address any constitutional claim of this importance and complexity on a completely undeveloped record is the nagging feeling that we may be missing something. I understand that the parties in this case probably do not have the resources to fund the kind of .research and analysis that these issues warrant. But, there have to be organizations with enough of an interest in this important topic that, had they been notified, probably would have appeared without compensation, at least as amici on appeal. And, if the majority believes that there is a viable constitutional argument preserved for appellate review, the proper course of action in this case would be a remand with directions that the trial court address that constitutional question in the first instance. See 16 Am.Jur.2d Constitutional Law § 132 (updated 2010) (explaining the need for parties “to fully brief and argue” a constitutional issue in the trial court “with thoughtful and complete arguments” so as to “furnish[ ] reviewing courts with an adequate record upon which to adjudge the constitutionality of the statute” and concluding that “[a] court should not rule that a statute is unconstitutional as applied to a particular case until a complete record has been developed.”); see also St. John v. Coisman, 799 So.2d 1110, 1119-20 (Fla. 5th DCA 2001) (“Because the constitutional issue we address ... was not raised in the trial court and has not been properly raised, briefed or argued in the proceedings before this court, I agree that the appropriate remedy is for this court to remand this case to the trial court to allow the parties the opportunity to do so....”) (Sawaya, J., concurring in part, dissenting in part).
C. Limited Response to Equal Protection Analysis.
1. Any Equal Protection Challenge to the Statute Should Be Analyzed Under the Rational Basis Test, and Appellant Has Not Demonstrated Any Basis for Relief under that Standard.
“[Ejqual protection is not a license for courts to judge the wisdom, fairness, or *824 logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor inflinges fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.” F.C.C. v. Beach Commc’ns., Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). The majority does not suggest that this case involves a “suspect class,” nor can it. See Lofton v. Sec. of Dep’t. of Children & Family Servs., 358 F.3d 804, 818 (11th Cir.), reh’g en banc denied, 377 F.3d 1275 (2004), and cert. denied, 543 U.S. 1081, 125 S.Ct. 869, 160 L.Ed.2d 825 (2005). And, I have already explained that this case does not implicate a fundamental constitutional right because the use of assisted reproductive technology is neither deeply rooted in our nation’s history and tradition nor so implicit in the concept of ordered liberty that neither liberty nor justice would exist if access to this technology were denied.[30] As such, “[t]he question is simply whether the challenged legislation is rationally related to a legitimate state interest.” Id. {citing Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). As further explained in Lofton:
Under this deferential standard, a legislative classification “is accorded a strong presumption of validity,” [Heller, 509 U.S.] at 319, 113 S.Ct. at 2642, and “must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification,” id. at 320, 113 S.Ct. at 2642 (citation omitted). This holds true “even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous.” Romer, 517 U.S. at 632, 116 S.Ct. at 1627. Moreover, a state has “no obligation to produce evidence to sustain the rationality of a statutory classification.” Heller, 509 U.S. at 320, 113 S.Ct. at 2643. Rather, “the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record.” Id. at 320-21, 113 S.Ct. at 2643 (citation omitted).
Id. If we were to entertain a constitutional challenge to section 742.14 under the rational basis test, it would end here — because Appellant has made no effort to “negative” any basis which might support the statute. See also Vance v. Bradley, 440 U.S. 93, 96-97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) (where a statutory classification neither “burdens a suspect group [n]or a fundamental interest” the “Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.”) (footnotes omitted); Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1577 (11th Cir.1989) (“social legislation is presumed valid if it is rationally related to a legitimate state interest.” (citation and internal quotation marks omitted)); Alamo Rent-A-Car, Inc. v. *825 Sarasota-Manatee Airport Auth., 825 F.2d 367, 370 (11th Cir.1987) (“[T]he equal protection clause allows governmental bodies wide latitude in enacting social and economic legislation; the federal courts do not sit as arbiters of the wisdom or utility of these laws.”).
2. Lehr and Related Cases.
The majority also attempts to make an equal protection argument grounded in Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), and other related cases which address the possibility of recognizing a protected liberty interest in a “natural father’s” biological connection to “his illegitimate child.” Those cases recognize a protected liberty interest only where the natural father has “come forward to participate in the rearing of his child.” Id. at 261, 103 S.Ct. 2985. Noting that Appellant developed a relationship with the child in this case, the majority claims that “it would pose a substantial equal protection problem to deny a unwed genetic mother” the same constitutional protection that the Supreme Court has recognized for a similarly-situated natural father under Lehr. However, the question of whether the Lehr due process analysis should be extended to this situation really has nothing to do with equal protection. In other words, the protections of the Equal Protection Clause apply to legislative classifications, not Supreme Court cases.
The easy response to Lehr is that it is not an assisted reproductive technology case. Significantly, the Lehr majority noted that: “‘The mother carries and bears the child, and in this sense her parental relationship is clear.’” Id. at 260, 103 S.Ct. 2985 (quoting Caban v. Mohammed, 441 U.S. 380, 397, 99 S.Ct. 1760, 60 L.Ed.2d 297 (Stephens, J., dissenting)). Because Lehr deals with rights of a natural father, it’s analysis does not translate to Appellant, who is not a natural parent. This is clear from Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1991), in which the Court refused to extend Lehr even to a natural father where doing so would interfere with the “family unit accorded traditional respect in our society” and would require the state to recognize two legal fathers.
Michael H. involved an “adulterous” relationship between Michael H. and a married woman, Carol D., during a time when Carol was separated from her husband, Gerald D. A child, Victoria, was born out of the relationship, who Michael held out to others as his own and treated as his own. Michael, Carol and Victoria even lived together for a time, while Carol and Gerald remained separated. However, Carol later reconciled with Gerald, and began denying Michael access to Victoria. Michael sued for visitation rights, arguing that under the Lehr line of cases he had a recognized liberty interest as a natural father who had participated in the rearing of his child and had developed a relationship with her. Part of the evidence presented to the trial court was a psychologist’s recommendation that it would be in Victoria’s best interest to maintain the relationship with Michael. The Supreme Court rejected Michael’s argument. As explained in Justice Scalia’s plurality opinion, fundamental liberty interests are only recognized if they are “interest[s] traditionally protected by our society” that are “ ‘so rooted in the traditions and conscience of our people as to be ranked as fundamental.’ ” Id. at 122, 109 S.Ct. 2333 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934)).
Applying this well-settled law, the Court summarized the issue in Michael H. as “reduc[ed] to whether the relationship between persons in the situation of Michael
*826 and Victoria has been treated as a protected family unit under the historic practices of our society,” and readily determined that Michael could not assert a fundamental liberty interest despite his biological and psychological connection to Victoria. Id. at 124, 109 S.Ct. 2333. In reaching this conclusion, the Court not only noted the state’s interest in protecting the “unitary family” accorded “traditional respect in our society,” but that: “California law, like nature itself, makes no provision for dual fatherhood.” Id. at 118 and 124 n. 3, 109 S.Ct. 2333; see also id. at 130-131, 109 S.Ct. 2333 (“[W]hatever the merits of the guardian ad litem’s belief that such an arrangement can be of great psychological benefit to a child, the claim that a State must recognize multiple fatherhood has no support in the history or traditions of this country.”).
What differentiates Appellant from the men who would be afforded protection under the Lehr line of cases is not that she is a woman. Rather, as in Michael H, it is that Appellant (or, more accurately, the majority, as Appellant herself never made the argument) is attempting to state a claim that has no support in the traditions of this country.
D. My Overriding Concern with the Majority’s Approach to the Constitutional Issues in this Case.
More than a century ago, Justice Oliver Wendell Holmes discussed the difficulty judges face when addressing issues in an emotionally-charged case like the one before us today. He explained that:
Great cases, like hard cases, make bad law. For great cases are called great ... because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend.
N. Sec. Co. v. United States, 193 U.S. 197, 400-01, 24 S.Ct. 436, 48 L.Ed. 679 (1904) (Holmes, J., dissenting). The facts before us distort judgment because we so readily sympathize with Appellant and the child in this case, and are naturally outraged by their treatment at the hands of Appellee. But, those natural feelings only serve to highlight the importance of our constitutional duty to look past the individuals in this case to the larger principles at stake. The larger principle at the heart of this case is the necessity for judicial restraint as a corollary to the power of judicial review.
Judicial review, in this context, refers to a court’s power to invalidate a legislative act as unconstitutional. See Black’s Law Dictionary 924 (9th ed. 2009) (defining judicial review as, inter alia, “[a] court’s power to review the actions of other branches or levels of government; esp., the courts’ power to invalidate legislative and executive actions as being unconstitutional” and “[t]he constitutional doctrine providing for this power”). Judicial review serves as an essential “check” or “balance” to bind the legislature to the rule of law— assuring that it neither exceeds its constitutional power through its acts nor violates the rights of the people secured by the Constitution.
Judicial restraint, in this context, refers to the principle that a court’s power of judicial review should only be used where the law demands it, and never as a means of simply substituting the values or judgment of the individual judges deciding a case for the values or judgment of the elected representatives of the people. See Black’s Law Dictionary 924 (9th ed. 2009) (defining judicial restraint as, inter alia, “[a] philosophy of judicial decision-making *827 whereby judges avoid indulging their personal beliefs about the public good and instead try merely to interpret the law as legislated and according to precedent”). Judicial restraint serves as the essential self-imposed “check” against the judicial branch’s abuse of power; and, “ ‘[o]nly by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.’ ” Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 365, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973) (quoting Carmichael v. S. Coal & Coke Co., 301 U.S. 495, 510, 57 S.Ct. 868, 81 L.Ed. 1245 (1937)). My overriding concern with the majority’s resolution of this case, and the most basic reason why I cannot join in their decision, is my belief that the majority opinion violates several well-defined principles of judicial restraint.
First, I have already explained that we should not reach the constitutional questions ultimately decided by the majority because they were neither preserved for appellate review in the trial court nor adequately presented on appeal. Reaching these issues under these circumstances violates the “fundamental rule of judicial restraint” that a court not “decide questions of a constitutional nature unless absolutely necessary[.]” Webster v. Reprod. Health Serv., 492 U.S. 490, 526, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (O’Connor, J., concurring) (internal quotations and citations omitted); see also Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) (“If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such [questions are] unavoidable”).
Second, the majority’s decision improperly discards “one of the first principles of constitutional adjudication — the basic presumption of the constitutional validity of a duly enacted state or federal law.” San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 60, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring). The majority discards this presumption by declaring that this case implicates Appellant’s fundamental rights. However, that declaration is itself inconsistent with principles of judicial restraint in that the majority in no way ties its fundamental rights analysis to our nation’s history or “deeply rooted” traditions. After all, it is only by firmly linking a fundamental rights determination to the historical “traditions and [collective] conscience of our people” that the judges are able to avoid preempting legislative action based upon nothing more than our “personal and private notions” of what constitutes a fundamental right. Griswold v. Connecticut, 381 U.S. 479, 493, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).
Third, as a related principle of judicial restraint, the United States Supreme Court has repeatedly cautioned that a substantive due process analysis “must begin with a careful description of the asserted right, for ‘[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.’ ” Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (quoting Collins v. Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)); see also Glucksberg, 521 U.S. at 721, 117 S.Ct. 2258 (“[W]e have required in substantive-due-process cases a ‘careful description’ of the asserted fundamental liberty interest.”) (internal citations omitted) and at 722-26 (stating that the asserted liberty interest at issue in the case was framed more properly as the “right to commit *828 suicide with another’s assistance” rather than the broadly-stated “liberty to choose how to die” or the “right to choose a humane, dignified death”). Contrary to this guiding principle, the majority frames the interest at stake in this case as broadly as possible, asserting that Florida’s ART legislation affects the previously recognized fundamental rights of procreation and parenthood. To use a prior analogy, this would be akin to analyzing a polygamist’s attack on section 826.01, Florida Statutes (making it a felony to marry another person when already married) as violating the recognized fundamental right to marry. By framing the issue as broadly as possible, the majority avoids the obvious: that neither procreation through assisted reproductive technology nor the recognition of two legal mothers to a single child implicate any interest that could even remotely be described as objectively deeply rooted in this nation’s history and tradition.
As explained not long ago by a former member of Florida’s Supreme Court: “Dating to Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the power assumed by the judicial branch of our government to declare acts of the Legislature unconstitutional has been acquiesced in by the legislative and executive branches on the representation that this judicial power will be used with restraint and only in the face of clear and compelling constitutional conflicts.” N. Fla. Women’s Health & Counseling Servs., Inc. v. State, 866 So.2d 612, 670-71 (Fla.2003) (Wells, dissenting). We should heed that reminder.

Conclusion

Because the trial court correctly applied the controlling case law and statutes, and because no other issue is preserved for appellate review, we should affirm the final judgment. Having said this, I fully agree with the majority that this case involves a question of great public importance that should be reviewed by the Florida Supreme Court. It is my hope that if the Supreme Court does accept review, it will at least be the beneficiary of a thorough briefing of the issues, so lacking in our review.

. See also Nancy D. Polikoff, A Mother Should Not Have To Adopt Her Own Child: Parentage Laws for Children Of Lesbian Couples in the Twenty-First Century, 5 Stan. J. Civ. Rts. & Civ. Liberties 201, 208 (2009) (“For most of our history, not just in America but in the common law tradition from which we get our laws, a child's legal parents were the mother who gave birth to that child and the man to whom she was married.”); Dorothy E. Roberts, The Genetic Tie, 62 U. Chi. L.Rev. 209, 253 (1995) ("The European-American tradition identifies a child's mother through the biological act of giving birth.”); Elizabeth E. Swire Falker, The Disposition of Cryopreserved Embryos: Why Embryo Adoption is an Inapposite Model for Application to Third-Party Assisted Reproduction, 35 Wm. Mitchell L.Rev. 489, 501(2009) ("well established common law presumptions provide that a woman who gives birth to a child will be deemed the legal and natural mother of that child”); Malina Coleman, Gestation, Intent, and the Seed: Defining Motherhood in the Era of Assisted Human Reproduction, 17 Cardozo L.Rev. 497, 524 (1996) ("The common law presumes that the birth mother is the legal mother of the child.").

. The majority does repeatedly posit that Florida’s legislature abrogated this rule by using the word "relinquish” in section 742.14. This argument is contrary to well-settled law. As explained in Thornber v. City of Fort Walton Beach, 568 So.2d 914 (Fla.1990):
The presumption is that no change in the common law is intended unless the statute is explicit and clear in that regard. Unless a statute unequivocally states that it changes the common law, or is so repugnant to the common law that the two cannot coexist, the statute will not be held to have changed the common law.
Id. at 918 (citations omitted). Section 742.14 does not reference the common law rule that the birth mother is the legal mother, much less explicitly, clearly or unequivocally state that it is changing it. The majority is really arguing that by choosing the word "relinquish” to describe the legal effect of an egg donation, the legislature has impliedly recognized a different common law rule. First, I do not believe that the word "relinquish” implies any such thing. Relinquish means to give up. All that section 742.14 says is that when you give up your genetic material, you also give up any legal claims that you could have made before your donated it. Second, even if use of this word did in some oblique way imply a different common law rule, the law does not permit abrogation of a well-settled common law rule in this manner. Id. This is especially true here, where all statutes the legislature has adopted that directly address the topic also clearly and unequivocally recognize the birth mother as the sole legal mother of the child.

. The term "egg” in this context refers to the female reproductive cell, also called an "oo-cyte” or "ova.”

. We are bound by this prior panel decision from our court until it is “overruled either by this court, sitting en banc, or a higher court.” Sturdivant v. State, - So.3d -, 2010 WL 3464410 (Fla. 1st DCA) (citations omitted), rev. granted, 47 So.3d 1290 (Fla.2010) (Table); see also In re Rule 9.331, 416 So.2d 1127, 1128 (Fla.1982).

. As the majority notes, when Appellant donated an egg for fertilization and implantation into Appellee, she signed a consent form acknowledging that she would have no claim of parental rights as to any child bom as a result of the donation.

. The statute provides exceptions for "a father who has executed a preplanned adoption agreement under s. 63.212,” and a "commissioning couple”. The statute defines a commissioning couple as "the intended mother and father” of the child. § 742.13(2), Fla. Stat. (2008).

. Cf. Lamaritata, 823 So.2d at 318-19 (holding that a man referred to as "donor” in contract for sperm donation was a sperm donor, not a parent, and had no parental rights under section 742.14). The majority attempts to distinguish Lamaritata on grounds *814 that "[ujnlike the instant case, the court in Lamaritata concluded that the man was a donor because a contract said he was a donor.” But, it is not clear to me that this "contract” was anything other than a donor form similar to the one signed by Appellant in this case, in which she "agree[d] that the recipient may regard the donated egg as her own and any offspring resulting there from as her own children.” And, the mother in La-maritata had agreed (in writing, according to the opinion) that the man could retain a vestige of parental rights — visitation with his "biological” child. In my view, the primary difference between the two cases is that the Lamaritata court applied the plain language of section 742.14 and held that the man was not a parent, and the majority in this case does not.

. See U.S. Const. Amend. XIV, § 1 and Art. I, § 2, Fla. Const.

. See Art. 1, § 23, Fla. Const.

. As noted by the majority, Appellant made similar conclusory constitutional allegations with respect to other statutes, all of which suffer from the same defects.

. This is the one passing acknowledgement by Appellant that Appellee enjoys a fundamental constitutional right as a parent. Citing to Kazmierazak v. Query, 736 So.2d 106 (Fla. 4th DCA 1999), Appellant argued that a third party can intrude upon a legal parent's fundamental rights by seeking custody or visitation where the third party makes a showing of "detriment to the child.” Appellant alleged that Appellee has caused detriment to the child by removing her to Australia, and that she should be allowed to present evidence in support of this argument to overcome Appellee’s constitutional claim.

. Circular reasoning was recognized as a formal logical fallacy as early as 350 B.C., when Aristotle penned Prior Analytics.

. Ironically, the majority supports this conclusion by claiming that it is evident from the "undisputed facts” established below. The irony is that Appellant herself claims on appeal that disputed issues of fact exist as to these issues, including the issue of her intent when donating her genetic material, that should have precluded summary judgment. In addition, the majority appears to rest its constitutional analysis in part on its perception regarding the "bond" formed between Appellant and the child and its conclusion that it would be in the child’s best interest for Florida to extend parental rights to Appellant. Yet, there has been no fact-finding as to these issues, and no affidavits were submitted at the summary judgment stage regarding either issue.

. The quoted passage notes that the affirmative right to procreate has only been directly addressed by the United States Supreme Court in one case — Buck v. Bell, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927). That case rejected procedural and substantive due process challenges to a mandatory sterilization statute directed at the "feeble-minded," and did not apply heightened scrutiny based upon a right of natural procreation. Although this case is uniformly criticized by scholars, see, e.g., Jessica L. Waters, In Whose Best Interest? New Jersey Division of Youth And Family Services v. V.M. and B.G. and the Next Wave of Court-Controlled Pregnancies, 34 Harv. J.L. & Gender 81, 91 (2011) ("Buck v. Bell is now considered a stain on the nation’s jurisprudence”), the case “has never been overturned, and [ ] is arguably still good law. In fact, it was cited favorably as recently as 2001.” Lisa Powell, Eugenics and Equality: Does the Constitution Allow Policies Designed to Discourage Reproduction Among Disfavored Groups?, 20 Yale L. & Pol'y Rev. 481, 502 (2002) (footnotes omitted).

. As science continues its advances, it is possible that genetic material from multiple males and multiple females could be combined to create a child. Since each genetic contributor would enjoy a fundamental procreative right, it would follow that each could claim a fundamental constitutional right to parent any resulting children under the majority’s circular proclamation that the right to procreate equates to a claim of parenthood with respect to children resulting from the genetic contribution. And, there are already those who term cloning as a form of procreation, and advocate for recognition of the right to use cloning technology as an extension of the "right to procreate.” See, e.g., Elizabeth Price Foley, The Constitutional Implications of Human Cloning, 42 Ariz. L.Rev. 647, 695 (2000) ("Because cloning is merely an asexual form of procreation, it is arguably as much a fundamental constitutional right as our right to procreate by either passion or the petri dish.”); John A. Robertson, Human Cloning and the Challenge of Regulation, 339 New Eng. J. Med. 119, 120 (1998) ("Whether described as 'replication' or as ‘reproduction,’ the resort to cloning is similar enough in purpose and effects to other reproduction and genetic-selection practices that it should be *821 treated similarly.”); Pratheep Sevanthina-than, Heavy Regulation of Human Cloning as an Alternative to a Complete Ban, 10 Quinnipi-ac Health L.J. 219, 242 (2007) ("[I]n light of Skinner, Lifchez, and the abortion cases, there seems to be a constitutionally protected right to procreate and therefore there may be a right to reproductive cloning.”).

. Again, Appellant's complaint below did not even allege a substantive due process violation under the Fourteenth Amendment to the United States Constitution. Instead, Appellant confined her privacy allegation to a claim under Article I, Section 23 of the Florida Constitution. However, because Article I, Section 23 is limited in its scope by Article I, Section 27 of the Florida Constitution, cf. State v. Geiss, 70 So.3d 642, 646-47 (Fla. 5th DC A), rev. granted, 70 So.3d 587 (Fla.2011), I doubt that the same arguments are even available to Appellant under the Florida Constitution's express privacy guarantee as may be available under the privacy protections implied in the United States Constitution.

. The test for recognizing a right as fundamental is the same irrespective of whether a court is applying the Due Process Clause or the Equal Protection Clause. See Ronald D. Rotunda and John E. Nowak, 2 Treatise on Const. L. § 15.4(a) (4th ed.); see also id. at § 18.3(a)(v) (“A law that burdens the ability of all persons to exercise a fundamental right will be examined under substantive due process. A law that uses a classification that burdens or impairs the ability of only one class of persons who wished to exercise a fundamental constitutional right will be examined under equal protection.”).